TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-05-00118-CV






Angela M. Blackwell, Appellant


v.


Mark M. Humble, Appellee






FROM THE DISTRICT COURT OF MILAM COUNTY, 20TH JUDICIAL DISTRICT

NO. 28,167, HONORABLE ED MAGRE, JUDGE PRESIDING





O P I N I O N



 Appellant Angela M. Blackwell appeals from the trial court's judgment limiting her
access to her children. Blackwell argues that the trial judge should have recused himself sua sponte,
that an assigned judge should have ordered the trial judge's recusal, and that the trial court abused
its discretion in limiting her access to the children, allowing the children's grandmother and uncle
to intervene, and naming them possessory conservators. We reverse the trial court's judgment in part
and remand the cause for further proceedings.


Background

 In October 2002, the trial court signed a final decree granting a divorce to Blackwell
and appellee Mark M. Humble and naming them joint managing conservators of their children, Mt.,
a son born in June 1996, and Md., a daughter born in November 1999. The children's primary place
of residence was with Humble, and Blackwell had visitation rights. 

 In January 2003, Humble filed a motion for enforcement and a motion to modify,
asserting that Blackwell had refused to return the children to Humble's care after a visit and had
threatened Humble in front of the children. Humble asked that Blackwell be held in contempt for
violating the divorce decree and sought orders barring her from speaking to him and requiring her
to arrange for a third-party to drop off and pick up the children. A hearing was held on Humble's
motion on February 13. On the morning of the hearing, Humble filed a supplemental petition asking
the court to suspend visitation pending a mental health evaluation of Blackwell, alleging that Mt.'s
grades had dropped recently, that Mt. seemed stressed, and that Blackwell told Md. to say that Betty
French, the children's paternal grandmother and Humble's mother, had "choked her and kicked her." 

 On March 7, the trial court signed an order requiring third-parties for pick-ups and
drop-offs, ordering psychological evaluations of both children, and holding Blackwell in contempt,
suspending a thirty-day jail sentence if Blackwell complied with the court's orders, paid $3,000 in
attorney's fees, refrained from interfering with the psychological evaluations and any recommended
treatment, and refrained from communicating with Humble except through the parties' attorneys. 

 On March 10, Humble filed an "amended supplemental" petition, describing more
troubling behavior by the children following visits with Blackwell. Humble alleged that the children
acted wild and uncontrollable after an extended visit with Blackwell and that Mt. was exhibiting
behavior similar to Blackwell's older son, who was placed in an in-patient psychiatric facility when
he was six years old but returned to normal behavior after he was removed from Blackwell's care. 
Humble asserted that the children's troubling behavior diminished when they were away from
Blackwell for prolonged periods of time. Humble feared Blackwell would place "enormous
pressure" on the children when they underwent their psychological evaluations and asked the court
to suspend Blackwell's visitation or, alternatively, to order supervised visitations. 

 On March 21, five days before the hearing on Humble's motion, Blackwell filed a
motion to recuse the trial court judge, Ed Magre, because he and Humble had practiced law together
in the past. Judge Magre referred the motion to Judge B.B. Schraub, the presiding judge of the Third
Administrative Judicial Region, who denied the motion without a hearing on March 25 because the
motion was not timely filed and did not allege sufficient grounds for recusal. The March 26 hearing
went forward as scheduled, and on April 2, the trial court signed an order limiting Blackwell to two
supervised two-hour visits with the children per month and ordering her not to make disparaging
remarks about Humble or his family. Because Dr. Frank Pugliese, the psychologist initially selected
by the court to evaluate the children, was unavailable, the court ordered that Dr. David Poole
evaluate the children within three weeks. The court set a status hearing in ninety days. On May 23,
Humble sent a letter to the trial court in which he stated that Dr. Poole's "reports will be done as
soon as he gets a bit of additional information." On May 30, the trial court sent Blackwell a letter
stating that enclosed with the letter were copies of Dr. Poole's reports; the reports themselves,
however, are not included in the record. 

 On June 19, Blackwell filed a second motion to recuse Judge Magre, stating that he
and Humble practiced law together in the past and citing to rule 18b of the rules of civil procedure. 
Blackwell asserted that Judge Magre should have recused himself on his own motion or on
Blackwell's first motion. Judge Magre again referred the motion to Judge Schraub, who assigned
it to Judge James Clawson, Jr. Humble filed a response, asserting that the grounds for recusal had
been disclosed during the divorce proceeding in October 2002 and that Blackwell had waived her
right to seek recusal. Following a hearing, Judge Clawson denied Blackwell's motion to recuse. 

 In August 2004, Betty French and Monty Humble, Humble's brother, filed a petition
in intervention seeking to be named possessory conservators of the children. Blackwell opposed the
petition in intervention, arguing that the intervenors lacked standing to intervene. The trial court
held a hearing in September 2004 to consider the petition in intervention and to reconsider
Blackwell's visitation schedule. Following a hearing in September 2004, the trial court signed a
judgment in January 2005, finding that the intervenors had had substantial and continued contact
with the children sufficient to warrant standing to intervene under the family code, naming the
intervenors as possessory conservators, and continuing to limit Blackwell's visitation with the
children to two supervised visits each month. It is from this judgment that Blackwell appeals.


Recusal

 In her first two issues, Blackwell argues that the trial court judge should have recused
himself from the case sua sponte. In her third issue, she argues the judge should have recused
himself when she filed her motion to recuse on June 19, 2003, and in her fourth issue, she contends
that the assigned judge should have granted her June 2003 motion. 

 Rule 18a of the rules of civil procedure governs the recusal or disqualification of
judges. A trial court may raise the issue of recusal on its own motion,
Esquivel v. El Paso Healthcare Sys., Ltd., 225 S.W.3d 83, 88 (Tex. App.--El Paso 2005, no pet.),
or a party may file a motion at least ten days before the date of trial or a hearing stating grounds for
the trial judge's recusal. Tex. R. Civ. P. 18a(a). The judge shall then either recuse himself or refer
the matter to the presiding judge of the administrative judicial district, who should either consider
the motion or assign another judge to hear the motion. Tex. R. Civ. P. 18a(c), (d). Grounds for
recusal of a trial judge include that "he or a lawyer with whom he previously practiced law has been
a material witness" in the case. Tex. R. Civ. P. 18b(2)(c). 

 We review a trial court's decision on a motion to recuse for an abuse of discretion. 
McElwee v. McElwee, 911 S.W.2d 182, 185 (Tex. App.--Houston [1st Dist.] 1995, writ denied). 
The erroneous denial of a motion to recuse does not void or nullify the court's later rulings. 
In re Union Pac. Res. Co., 969 S.W.2d 427, 428 (Tex. 1998). If the grounds for recusal are fully
disclosed on the record, a party may waive her right to seek recusal. Tex. R. Civ. P. 18b(5). Without
a proper and timely motion to recuse, rule 18a's mandatory provisions are never triggered. 
Beard v. Beard, 49 S.W.3d 40, 51 (Tex. App.--Waco 2001, pet. denied) (quoting Wright v. Wright,
867 S.W.2d 807, 811 (Tex. App.--El Paso 1993, writ denied)); see McElwee, 911 S.W.2d at 186
("If a party fails to comply [with rule 18a], he waives his right to complain of a judge's failure to
recuse himself.").

 Judge Ed Magre presided over the parties' divorce proceeding, signing the decree on
October 8, 2002, and exercised continuing jurisdiction over issues related to the children under the
family code. See Tex. Fam. Code Ann. §§ 155.001-.003 (West 2002). Appellee Humble is a lawyer
who has been in practice since 1973 and whose father is a retired trial court judge in Milam County. 
Humble testified that he and Magre were partners together in two different law firms from 1977
through 1986. They were partners in their own firm for two or three years and then partners with
several other attorneys for about seven years; the two had not been in practice together for fifteen
or sixteen years. Humble described his departure from his practice with Magre as "unpleasant" and
"rather acrimonious" and "thought for about ten years [Magre] was pretty unhappy about it." 
Humble did not believe Magre would show him any favoritism.

 At the October 2002 hearing on the parties' divorce, Blackwell contested whether an
agreement between the parties should be enforced and incorporated into the divorce decree, and the
issue of Magre's impartiality arose. Blackwell testified that she had signed the agreement under
duress, explaining, "I was fearful that Mark [Humble] had already talked to the Judge and that he's
already told the Judge about this case and had already made arrangements for this case and that I
would be lucky to have supervised visits with my children." She testified, "I had a lot of people
come to me and tell me I wouldn't get a fair trial here and that I better get this moved out of Milam
County." Later, during arguments about the enforceability of the agreement, Humble's attorney said:


I must say something about the suggestion about what's going on with the Court and
the Court's violation of its duty that she alleges. At that point one must either be
quiet about the trial court or file the proper motions to bring it properly . . . but you
can't say that a Judge is corrupt and then come and ask for his protection.


Blackwell's attorney, who is board certified in family law and has been licensed since 1986, replied:



[F]or him to also come in and say that I should have filed a Motion to Recuse, how
dare I come in here and try to get justice from this Court is also preposterous. I have
absolute faith and confidence in this Court, once this Court gets to hear what the facts
are. I don't have to file a Motion to Recuse if I believe this Court can be fair and
impartial and I believe so, or else I would have filed something differently. 



 Blackwell first argues that Judge Magre should have raised the issue sua sponte and 
recused himself without a motion after he signed the decree because it "became clear at that hearing
that the case would go beyond the issue of enforcing a negotiated settlement" and contends that we
should reverse the rulings made after the decree was signed and reinstate the decree's provisions. 

 We do not agree that Judge Magre was somehow impartial enough to have presided
over a June 2002 hearing on temporary orders, the record for which is not before us, the October
2002 hearing, and the subsequent signing of the divorce decree, but not impartial enough to have
continued to exercise jurisdiction over the case after the decree was finalized. At the October
hearing, the parties disputed whether Blackwell signed the agreement voluntarily or under duress,
which she argued was at least in part due to her concerns about a back-room deal between Humble
and Judge Magre. Despite those concerns, however, Blackwell's board-certified and experienced
attorney stated she did not doubt the judge's ability to be fair and did not want to file a motion to
recuse. Even if we were to assume that Judge Magre had an absolute duty to raise the issue of
recusal on his own motion, Blackwell stated she did not wish to have the judge recused, and
Blackwell has not cited any authority that would require Judge Magre to insist on recusing himself
over the parties' wishes. We overrule Blackwell's first two issues.

 Turning next to Blackwell's argument that her motion should have been granted and
that Judge Magre should have recused himself when she filed the motion, we note that Blackwell's
testimony shows she was aware of Humble's relationship with Judge Magre well before the October
2002 hearing. Despite this knowledge, Blackwell did not file a motion to recuse before the decree
was signed. Although she testified that she worried that Humble had worked out an agreement with
Judge Magre before trial, when Humble raised the issue of the judge's impartiality, Blackwell's
attorney stated in no uncertain terms that she did not want to file a motion to recuse and believed
Judge Magre would be fair and impartial. Her motion was filed five months later, in late March
2003, one month after the trial court modified its divorce decree and held Blackwell in contempt for
violating the decree, and was insufficient under rule 18a because it did not state grounds for recusal. 
See Tex. R. Civ. P. 18a. Nevertheless, Judge Magre referred the motion to Judge Schraub, who
denied it, finding it was untimely filed and failed to allege sufficient grounds for recusal. 

 Three months later, in June 2003, Blackwell filed a second motion, asserting
Humble's and Judge Magre's work relationship as grounds for recusal and stating that Judge Magre
should have recused himself on his own motion. Judge Magre again referred the motion to Judge
Schraub, who assigned Judge Clawson to consider the motion. In July 2003, Judge Clawson held
a hearing and considered the language of rule 18b, including its provision stating that parties may
waive their rights to seek recusal. He noted his discomfort with the way the rules are written, but
concluded, "The structure of the statutes, I think, . . . is such that you have to conclude that the rule
contemplates that this can be waived and if you go with that interpretation then it has been waived
and I would therefore overrule the Motion to Recuse Judge Magre." 

 Blackwell's June 2003 motion was filed a year after the first hearing in the case and
eight months after the decree was signed. The prior relationship between Humble and Judge Magre
was well known and was discussed in October 2002. Thus, the June 2003 motion was untimely. 
See Tex. R. Civ. P. 18a(a), 18b(5); Beard, 49 S.W.3d at 51. Further, Blackwell's trial counsel
explicitly stated that she did not question Judge Magre's impartiality and did not want to have the
judge recused. Having reviewed the reporter's records from the October 2002 and July 2003
hearings, we cannot hold that Judge Clawson abused his discretion in denying Blackwell's motion
to recuse. Likewise, we cannot hold that Judge Magre, who we have held did not abuse his
discretion in not recusing himself sua sponte, was legally obligated to recuse himself once
Blackwell's untimely motion to recuse was filed. We overrule Blackwell's third and fourth issues
on appeal.


Blackwell's Access to Her Children

 On April 2, 2003, the trial court signed an order modifying the provisions governing
possession of the children. The court found "that the material allegations contained in [Humble's]
Amended Supplemental Petition are true and that the requested modifications are in the best interest
of the children" (1) and ordered Blackwell's visitations restricted to supervised two-hour visits on the
first and third Wednesdays of each month. In its final judgment, signed January 25, 2005, the trial
court continued those same modified provisions. In her fifth issue, Blackwell contends that the trial
court abused its discretion in restricting her access to and possession of her children. Blackwell
argues that the court abused its discretion by modifying its decree because Humble did not show a
change in the parties' circumstances that would justify the modification. See Tex. Fam. Code Ann.
§ 156.101 (West Supp. 2007). She further contends the court abused its discretion in incorporating
the modified visitation into its final judgment issued on January 25, 2005. 

 To obtain a modification of a joint managing conservatorship, a party must show (1) a
material and substantial change in circumstances and (2) that the change would be in the child's best
interest. (2) Id. We review a trial court's modification of a joint managing conservatorship for an
abuse of discretion. (3) Echols v. Olivarez, 85 S.W.3d 475, 477 (Tex. App.--Austin 2002, no pet.). 
"The trial court is in the best position to observe the demeanor and personalities of the witnesses and
can 'feel' the forces, powers, and influences that cannot be discerned by merely reading the record,"
and we will not find an abuse of discretion provided some substantive, probative evidence supports
the court's decision. Id. When applying the abuse-of-discretion standard to a trial court's decision
to modify its provisions related to possession and custody of children, we ask first whether the trial
court had sufficient information on which to exercise its discretion, applying a traditional sufficiency
review, and if so, whether it acted reasonably in the application of its discretion. Id. at 477-78. 


Factual Summary

 Between February 2003 and September 2004, the trial court held four hearings in
which evidence relevant to Humble's motion to modify was introduced. We have carefully reviewed
the transcripts from all of the hearings and will condense the testimony from the various hearings
into a brief summary to assist in our review of the trial court's ruling. Some of the testimony was
about the parties' pre-divorce conduct or about Blackwell's three older children, who are not part
of this proceeding. We recognize that evidence of pre-divorce conduct is not by itself relevant or
admissible to obtain a modification, but such evidence may be offered to corroborate allegations and
evidence of similar conduct since the decree. Hollon v. Rethaber, 643 S.W.2d 783, 784
(Tex. App.--San Antonio 1982, no writ) (quoting Wilson v. Elliott, 73 S.W. 946, 947 (Tex. 1903)).


1. Evidence of pre-divorce conduct or related to Blackwell's older children

 Humble testified that during their marriage, Blackwell told him she had been
diagnosed with borderline personality disorder. He also testified that E.B., Blackwell's oldest son,
had been diagnosed with oppositional defiant disorder and was a dangerous child and committed to
a psychiatric hospital for a month when he was six years old. Humble and another witness testified
that once E.B. was placed with his biological father, he turned into "a wonderful child." Humble
thought Blackwell's two older daughters were anti-social or sociopathic. Andy and Sondra Andrews,
Humble's neighbors, testified about several incidents during the marriage when they saw Blackwell
neglect or ignore Mt., who was left to cross a busy road or play on a beach by himself. Blackwell
denied being diagnosed with a borderline personality, explaining that during graduate school a
classmate diagnosed her with features of borderline personality. 


2. Evidence related to post-divorce conduct

 Asked what circumstances had changed since the divorce decree was signed, Humble
said, "This continued poisoning of the children." Humble said that Blackwell's negative remarks
were very unhealthy for the children. Mt. had asked Humble why he had "run Mama out of the
house" or "[i]nto the Street" and told Humble that he could do whatever he wanted to at Blackwell's
house. Md. had begun "parroting" things such as, "Your [sic] going to die in sixteen years," and,
"I can't smell alcohol, Daddy, but Mama can." When Humble asked why Md. had abruptly decided
she disliked one of Humble's friends with whom she had been close, Md. said, "How do I know who
I'm supposed to believe, I'm only four?" Humble testified that the children were having bad dreams
about Blackwell, that Mt. was unhappy and withdrawn, that Mt.'s grades were declining, and that
Mt. had started to show oppositionally defiant behavior similar to that exhibited by E.B. Humble
said that after the children returned home after a long visit with Blackwell, their "behaviors were
astoundingly bad." He also testified that Blackwell told Md. to lie about being abused by French:


[Mt.] said [Md.] lied when she said that Nana had choked and kicked her[], he said
"That's a lie, because that didn't happen" and [Md.] very promptly said "Daddy, I
didn't lie, Mama told me to say that."


 After Blackwell's visitations had been limited to two supervised visits a month,
Humble testified that Mt.'s mood had improved, he had gained weight and self-confidence, he had
improved in his reading ability, and he no longer had discipline issues at school or at home. Humble
also said Md. was doing well and was well-adjusted and happy. 

 After Blackwell reported French's alleged abuse of Md., the police called Child
Protective Services to investigate. Caseworker Shannon Soechting interviewed Md., who said that
she felt safe at Humble's and French's houses. Mt. told Soechting that French never hit him or Md.,
French denied the allegations and appeared to Soechting to be truthful, and Soechting ruled out the
allegations. French testified that she was a retired registered nurse and was very close with the
children. French denied choking or kicking Md. and testified that shortly after the divorce, Md. said,
"Mother says you're a stink-head." Don Humble, Humble's father and French's ex-husband,
testified that while he was caring for the children recently, Md. said, "I hate Nana [French]. Nana
hurts me." She then turned to him and said, "I don't like you, you hit me." Don told her she knew
that was not true, and Md. "started giggling about it," as if it were a joke. 

 Darnesha McGregor, who babysat for the children, never saw Blackwell hurt the
children or fight with Humble, but testified that Blackwell told her that Blackwell told Md. that
"Grandmama [French] is mean and she hit you." McGregor further testified that since the divorce,
Blackwell said negative things about Humble in front of the children. Andy Andrews, who was the
former principal of Mt.'s school, testified that Mt. became "very withdrawn" after the divorce and
that Mt.'s teacher thought Mt. needed "some help, some intervention, possibly some counseling." Blackwell testified that she married Kendall Hightower in June 2003. Although she
filed for divorce in June 2004, the divorce proceeding was on hold while she and Hightower tried
to work out their marriage. Blackwell testified that Hightower is bipolar and has mood swings,
which are moderated by medication, but when he stops taking his medication, he becomes very
erratic. Asked whether it was safe to allow Hightower around the children, she said, "I don't
know--you know, when these incidents occurred, I don't know if he was on his medication. . . .
When he's on his medication, I don't know that there's a problem." Blackwell said that if the court
ordered her not to allow Hightower around Mt. and Md., she would comply and that Hightower had
never been violent toward her or her children. The trial court admitted into evidence a number of
email communications from Hightower to various people, including Blackwell, Humble, and
Humble's attorney. Many of the emails were violent and threatening in tone, and Hightower
threatened to hunt down several men he thought were behaving inappropriately toward Blackwell
and threatened to kill one man in particular. In other emails, however, Hightower said he would
never harm anyone and that he was in control of himself. Blackwell testified that many of the
threatening statements were made while Hightower was off his medication.

 Blackwell believed French had hit, choked, and kicked Md. and said that French had
beaten and choked Humble when he was a child. Blackwell's oldest child testified that she had
never seen violence between her mother and Hightower and that she did not think Mt. and Md.
would be in danger if Blackwell had more visitation. One of Blackwell's coworkers and one of her
friends testified that Blackwell was a good, attentive parent and that they never saw inappropriate
behavior or heard her disparage Humble in front of the children. 

 Psychologist Charles Pierce testified about borderline personality disorder and its
symptoms in general and said that a parent with the disorder would cycle between affection and
anger or neglect, which would confuse and harm a child. Dr. Pierce also reviewed Hightower's
medical records, which showed that Hightower stopped taking his medications because he believed
he was well, he could not afford them, he did not like the sexual dysfunction they caused, and "his
wife had asked him to stop taking the medications because of the sexual dysfunction." Pierce noted
Hightower's paranoid delusions and homicidal threats and said Hightower "would be dangerous
around anyone who set off that mood in that kind of condition." Dr. Pierce did not treat or examine
the children, and although the record reflects that Dr. Poole evaluated the children and produced
reports for the trial court and the parties, his reports are not contained in the record, mentioned by
the parties in any hearings, or referenced by the trial court's later orders. Indeed, the record does not
reflect whether the trial court read or considered the reports in reaching its decisions.


Change of Circumstances

 We ask first whether the trial court had substantive and probative evidence on which
to base its decision that the parties' circumstances had changed so as to justify a modification of the
conservatorship provisions. See Echols, 85 S.W.3d at 477-78. Although several witnesses testified
that Blackwell was a good, attentive mother who never abused her children, there was also testimony
that since the divorce, she had neglected the children and disparaged Humble and his family in their
presence, which confused and depressed the children. See In re Marriage of Chandler, 914 S.W.2d
252, 254 (Tex. App.--Amarillo 1996, no writ) (poisoning child's mind against parent can be
grounds for modification). Further, she had married a man who is bipolar and who made violent
threats toward her and people he perceived were interfering with their relationship. See
In re C.Q.T.M., 25 S.W.3d 730, 734 (Tex. App.--Waco 2000, pet. denied) (remarriage and step-parent's conduct and abilities may be considered in modification proceeding). There was evidence
that since the divorce, the children's behavior, school performance, and moods had suffered and that
both children exhibited behavior showing that Blackwell had manipulated them into saying bad
things about Humble and his mother. The trial court as fact-finder was obligated to consider all the
evidence and resolve any evidentiary conflicts. See Lilley v. Lilley, 43 S.W.3d 703, 705
(Tex. App.--Austin 2001, no pet.). The trial court did not abuse its discretion in determining that
there was evidence from which it could conclude that the circumstances had changed and that a
modification would be in the children's best interests. See Tex. Fam. Code Ann. § 156.101. We
next consider whether the trial court properly exercised its discretion in determining the restrictions
it placed on Blackwell's possession and access.


Restrictions on Blackwell's Possession

 Blackwell argues on appeal that the restrictions placed on her are "draconian,"
"usually reserved for mothers who have burned or scalded a child, broke[n] a child's limb, beaten
a child, exposed a child to narcotics and dangerous [drugs], sexually abused the child or allowed a
boyfriend to do so." She argues that there is no evidence to justify the restrictions, other than the
trial court's "simply doing for his ex-partner, whatever the ex-partner asks him to do."

 Certainly, there was evidence presented in this case on which the trial court could
have determined that the children's best interests would be served by restricting Blackwell's
possession and access. (4) However, this record lacks findings that would allow us to determine
whether the trial court appropriately exercised its discretion in imposing the severe limits that it
chose. Therefore, we must reverse the portion of the judgment that denies Blackwell's possession
and limits her access to two supervised visits a month and remand the case for further proceedings.

 It is left to a trial court's discretion to establish the terms and conditions of
conservatorship. In re L.M.M., No. 03-04-00452-CV, 2005 Tex. App. LEXIS 7191, at *28-29 (Tex.
App.--Austin Aug. 31, 2005, no pet.) (mem. op.). The trial court has the authority to determine
frequency and duration of visits and to place any necessary limitations and safeguards on visitations. 
Id. at *29. The child's best interest is the primary consideration in deciding to limit a parent's
possession of and access to her child, Ditraglia v. Romano, 33 S.W.3d 886, 889 (Tex. App.--Austin
2000, no pet.), and the family code expresses a strong presumption that it is generally in a child's
best interest to have significant contact with both parents. (5) See Tex. Fam. Code Ann. § 153.131
(West 2002), § 153.137 (West Supp. 2007). Absent a finding of family violence, a trial court
considering an original proceeding concerning conservatorship should appoint both parents as joint
managing conservators unless the court finds such appointment "would significantly impair the
child's physical health or emotional development." Id. § 153.131; see In re V.L.K., 24 S.W.3d 338,
343 (Tex. 2000) (chapters 153 (governing original proceedings) and 156 (governing modification
proceedings) are "distinct statutory schemes that involve different issues" and impose different
standards and burdens of proof, and chapter 153 presumptions are not carried over into chapter 156).

 Chapter 153, which governs original custody proceedings, provides that a trial court
is to be guided by a presumption that the standard possession order provides the "minimum amount
of time for possession of a child by a parent named as a joint managing conservator,"
Tex. Fam. Code Ann. § 153.137, although the court is not required to order standard possession. As
we discussed in In re L.M.M., if the court decides in a modification proceeding that standard
possession is not in the child's best interest, it may deny possession and access or craft an order
placing restrictions on possession or access that will eliminate the danger posed to the child's
physical or emotional well-being. 2005 Tex. App. LEXIS 7191, at *29 (quoting In re Walters,
39 S.W.3d 280, 286 (Tex. App.--Texarkana 2001, no pet.)). A court may not, however, deny a
conservator's rights of possession and access absent a finding that possession and access would
endanger the child's welfare, and "any limitations on such rights cannot exceed that [sic] required
to protect the child's best interest." Id. at *29-30. 

 Under the trial court's modified judgment, Blackwell retains limited rights of access
to Mt. and Md., but she has been denied possession. See id. at *34. Although we recognize that the
trial court did not altogether deny Blackwell's right to access to the children, which we would
scrutinize closely to be sure was supported by "extreme grounds," see Allison v. Allison, 660 S.W.2d
134, 137 (Tex. App.--San Antonio 1983, no writ), the severe limits placed on her contact with her
children still require our careful review. 

 The trial court did not make and Blackwell did not request findings of fact, which
generally results in our making implied findings supported by the record. (6) See Niskar v. Niskar,
136 S.W.3d 749, 753 (Tex. App.--Dallas 2004, no pet.). However, by continuing Blackwell's
appointment as joint managing conservator in the orders in question here, the trial court impliedly
found that her possession of or access to the children would not significantly endanger their physical
or emotional welfare. See Tex. Fam. Code Ann. § 153.131(a); Roosth v. Roosth, 889 S.W.2d 445,
451 (Tex. App.--Houston [14th Dist.] 1994, writ denied) (appointment of party as possessory
conservator showed implied finding that party's "possession or access to the children would not
endanger the physical or emotional welfare of the children"). The trial court's denial of Blackwell's
possession and its severe restrictions on her access to the children give rise to implied findings that
conflict with those arising from her continued status as a joint managing conservator of the children. (7) 

 There was sufficient evidence to support the trial court's decision that some
limitations on Blackwell's possession and access would be in the children's best interests. However,
the duration and severity of the restrictions and the difficulty Blackwell will face in seeking future
modifications that might allow her more contact with her children cause us some concern. While
the trial court may have believed that the evidence justified the severe restrictions it placed on
Blackwell, those restrictions seem inconsistent with the court's decision to maintain her as a
managing conservator, and we are left to speculate about what, in fact, it did believe. Because the
trial court made no findings of fact and because the implied findings that spring from the court's
determinations are in conflict, we are unable to discern what guiding rules and principles the court
applied and whether the court appropriately exercised its discretion in denying Blackwell's
possession and limiting her access to her children. 

 We recognize that Blackwell did not explicitly raise the issue of best interest in her
appellate brief. However, she attacks the modification globally, and in deciding to modify a parent's
contact with her children, the children's best interests must always be the trial court's primary
concern. See Tex. Fam. Code Ann. § 156.101 (modification of existing conservatorship order); see
also L.M.M., 2005 Tex. App. LEXIS 7191, at *29 (court may limit possession and access if standard
possession would endanger child's best interest). We share the dissent's concerns and agree that,
generally, we should defer to the trial court's judgment in reviewing modification orders. However,
because the trial court imposed strict restrictions on Blackwell's contact with her children, which
we must consider carefully, we cannot ignore the issue of best interest and cannot ignore the fact
that, without some explanation, the trial court's orders would seem to be based on conflicting best
interest findings. Under these circumstances and given the passage of time since the trial court
restricted Blackwell's contact with the children, we believe that remand, which will allow the trial
court to consider the parties' circumstances anew, as well as additional testimony and any available
evidence about the children's psychological conditions, is the best solution. Remand will give the
court the opportunity to resolve some of the conflicts that we have discussed and to ensure that the
restrictions placed on Blackwell are indeed in the children's best interests and do not exceed those
required to protect the children. See L.M.M., 2005 Tex. App. LEXIS 7191, at *29-30. We therefore
reverse the portion of the judgment restricting Blackwell's visitation and remand the case to the trial
court for further proceedings consistent with this opinion. See Hopkins v. Hopkins, 853 S.W.2d 134,
138-39 (Tex. App.--Corpus Christi 1993, no writ) ("As the trial court's findings are contradictory,
. . . we remand the case to the trial court so that it may determine whether appellant's access to the
children is in the children's best interest, and if so, what limitations to appellant's rights as
possessory conservator are in the children's best interest.").


Intervenors

 In her sixth and final issue, Blackwell complains that the trial court abused its
discretion in allowing the children's grandmother and uncle to intervene and in appointing them as
possessory conservators of the children.

 A non-parent may not file an original suit seeking to be named possessory
conservator, but a grandparent or other person who the trial court finds has had substantial past
contact with a child may be granted leave to intervene in a pending suit concerning child custody. 
Tex. Fam. Code Ann. § 102.004(b) (West Supp. 2007). (8) We review a trial court's decision to allow
a petition in intervention for an abuse of discretion. McCord v. Watts, 777 S.W.2d 809, 812
(Tex. App.--Austin 1989, no writ).

 When French was asked about her petition in intervention, she said she wanted to
have defined legal rights to the children. Asked whether she was having trouble seeing the children
and what the purpose of her petition was, she answered that she was able to see the children and
wanted to see them have healthy development. She agreed when asked whether she would want to
raise the children should anything happen to Humble, saying, "I feel like I'm competent and I think
that would be in the children's best interest." Monty Humble, Humble's brother, testified that he
wanted to have defined legal rights to the children to protect them. He testified that he had "seen
them regularly during their lives." He said that the "current purpose" of his petition was to be named
co-possessory conservator, not to be named a future managing conservator, but that he "want[ed] to
be available if Mark is unavailable." He testified that "the key issue is whether the children could
visit us without Mark present and whether we would be able to take care of them during that time." 

 We agree with Blackwell that Monty Humble did not show that he had "substantial
past contact" with the children. Monty testified only that he had "seen them regularly." Without 
more, this does not show substantial past contact sufficient to warrant his intervention, especially
in this case in which both parents are living and present and there is no testimony that the children
are at risk living with Humble. Therefore, based on the meager facts presented with regard to Monty
Humble's relationship with the children, we hold that the trial court erred in allowing him to
intervene and in appointing him as a possessory conservator. We reverse that portion of the
judgment.

 As for French, based on the evidence about the post-divorce circumstances, we cannot
hold that the trial court abused its discretion in allowing her to intervene. She frequently cared for
the children, lived nearby, and spent a great deal of time with the family, and the trial court
reasonably could have determined that she showed substantial past contact with the children. We
must then consider whether the trial court abused its discretion in naming her possessory
conservator. 

 If a child's managing conservator dies or is incapacitated and the right to possession
of the child is not governed by an order, a parent has superior rights of possession over a non-parent. 
See In re P.D.M., 117 S.W.3d 453, 459-60 (Tex. App.--Fort Worth 2003, pet. denied) (death of
managing conservator ends conservatorship order for possession purposes, and if managing
conservator parent dies, "someone must take immediate possession of the children, and the
possessory conservator parent's right of immediate possession is superior to others' rights"); see also
Tex. Fam. Code Ann. § 157.376 (West 2002). If a court appoints a managing conservator, it "may"
appoint one or more possessory conservator as well. Tex. Fam. Code Ann. § 153.006 (West 2002).

 Humble testified that he wanted his mother and brother to have legal rights to care
for the children in case anything happened to him and that he did not want Blackwell ever to have
primary custody over the children. He worried that if Hightower was "fed" an idea about the murder
of a prominent man in a small town and then told that Humble was "likely to kill" Hightower, "it
doesn't take too much to figure out that A plus B is maybe going to equal C. It's sort of like sending
him at me like a Manchurian Candidate or something." Humble essentially argued that he feared
Hightower would try to kill or hurt him and that he wanted his mother and brother to be appointed
possessory conservators to ensure that someone other than Blackwell would care for the children.

 French and Humble testified that French had a close relationship with the children
and spent significant amounts of time with them. French, a retired nurse, helped Humble make
health-care decisions and sometimes took the children to the doctor. She also babysat and helped
care for the children. Further, Humble testified that he feared Hightower could be dangerous if he
was led to believe that Humble was a threat. There was testimony about Hightower's mental
instability and about how the children suffer when in Blackwell's care for long periods of time. 

 Blackwell and Humble are both named joint managing conservators and, therefore,
the trial court's judgment does not run afoul of section 153.131's presumption that it is in a child's
best interest for her parent or parents to be appointed managing conservator. See Tex. Fam. Code
Ann. § 153.131(b) (West 2002). Because Humble and Blackwell are joint managing conservators,
the court had the power to appoint one or more possessory conservators. See id. § 153.006. 
Although this case differs from most cases involving the appointment of non-parent possessory
conservators, we cannot hold that the trial court abused its discretion in deciding that it was in the
children's best interest to name French as possessory conservator. See Holley v. Adams, 544 S.W.2d
367, 371-72 (Tex. 1976) (discussing factors to be considered in determining child's best interest);
In re M.A.M., 35 S.W.3d 788, 790 (Tex. App.--Beaumont 2001, no pet.) (discussing application of
Holley factors in conservatorship dispute between potential adoptive parents and maternal
grandmother). 

 Further, in the present circumstances, French's appointment has no practical effect. 
Should something happen to Humble, the trial court would then have to determine how to best serve
the children's best interests in deciding how to allocate their care between Blackwell and Humble,
considering the situation presented at that time. Considering the evidence presented by this case, we
cannot hold that the trial court abused its discretion in naming French possessory conservator.




Conclusion

 We have held that the trial court did not err by failing to recuse itself sua sponte or
upon Blackwell's untimely motion, that the assigned court did not err in denying Blackwell's motion
to recuse, and that the trial court did not err in allowing French to intervene and in naming her a
possessory conservator. It was error, however, to allow Monty Humble to intervene and seek to be
named possessory conservator. Finally, we cannot adequately review the trial court's severe
restriction on Blackwell's possession of and access to her children. Therefore, we reverse the
portions of the trial court's judgment appointing Monty Humble as possessory conservator and
restricting Blackwell's access. We remand the cause to the trial court for further proceedings related
to Blackwell's possession of and access to her children.


 __________________________________________

 David Puryear, Justice

Before Justices Patterson, Puryear and Henson;

 Concurring and Dissenting Opinion by Justice Patterson


Affirmed in part; Reversed and Remanded in part

Filed: December 14, 2007
1. In his "supplemental" petition, Humble set out various allegations related to Blackwell's
treatment of the children and the children's behavior following an extended visit with Blackwell. 
He stated that since his separation from Blackwell, circumstances had materially and substantially
changed in that Blackwell was no longer being cooperative with Humble or complying with the trial
court's orders. Humble alleged that Blackwell had begun threatening him "with vague revelations
about his shortcomings," arbitrarily moving pick-up and drop-off times related to visitation, and
"flying in to [sic] a rage about small things." 
2. The standard for modifying a joint managing conservatorship is less stringent than that
applied for modifying a sole managing conservatorship. Echols v. Olivarez, 85 S.W.3d 475, 478
(Tex. App.--Austin 2002, no pet.). 
3. See In re J.R.D., 169 S.W.3d 740, 746-52 (Tex. App.--Austin 2005, pet. denied) (Puryear,
J., concurring) (arguing that standards of review applied to conservatorship issues are inconsistent
with constitutional nature of parental rights and arguing that clear-and-convincing standard should
be applied). 
4. We bear in mind the distinction between possession and access. See In re L.L.M., No. 03-04-00452-CV, 2005 Tex. App. LEXIS 7191, at *34 (Tex. App.--Austin Aug. 31, 2005, no pet.)
(mem. op.) (access allows conservator to visit and communicate with child; possession allows
conservator to exercise control over child to exclusion of others); see also Tex. Fam. Code Ann.
§ 153.135 (West 2002) ("Joint managing conservatorship does not require the award of equal or
nearly equal periods of physical possession of and access to the child to each of the joint
conservators.").
5. The natural right between parents and children is of constitutional dimension. See Holley
v. Adams, 544 S.W.2d 367, 370 (Tex. 1976). Blackwell raises a constitutional argument on appeal
but did not raise it before the trial court. Therefore, we will not address it. See Tex. R. App. P. 33.1;
Carrizales v. Tex. Dep't Protective & Regulatory Servs., 5 S.W.3d 922, 925 (Tex. App.--Austin
1999, pet. denied) (constitutional challenge not raised in trial court is waived on appeal).
6. We recognize that section 156.101 of the family code does not specifically require a trial
court to make written findings of best interest in a modification proceeding. Tex. Fam. Code Ann.
§ 156.101 (West Supp. 2007). However, section 156.101 bars a trial court from modifying a custody
order unless the modification is in the child's best interest. Id. Based on our review of the record
and without more explicit findings and explanation by the trial court, we do not believe we can
properly evaluate the modification and restrictions the court placed on Blackwell's contact with her
children in light of the court's finding that it was in the children's best interest for Blackwell to
remain a joint managing conservator.
7. The temporary order that first limited Blackwell's visitation stated that the trial court found
"that the material allegations contained in the Amended Supplemental Petition are true and that the
requested modifications are in the best interest of the children."
8. In 2005, the legislature amended section 102.004 to add a further condition on someone
seeking to intervene and seek possessory conservatorship. Under the amended statute, a grandparent
or a person with significant past contact may intervene in a pending suit only if there is "satisfactory
proof . . . that appointment of a parent as a sole managing conservator or both parents as joint
managing conservators would significantly impair" the child. See Act of May 29, 2005, 79th Leg.,
R.S., ch. 916, § 3, 2005 Tex. Gen. Laws 3148, 3149 (effective June 18, 2005, current version at Tex.
Fam. Code Ann. § 102.004(b) (West Supp. 2007)). These proceedings were underway before the
amended statute's effective date, thus, we apply the version in effect at the time. Id. at 3155, § 25. 
Because the language referenced above was not changed by the amendment, we cite to the current
version. See Act of Apr. 6, 1995, 74th Leg., R.S., ch. 20, § 1, 1995 Tex. Gen. Laws 113, 125.